ESTATE OF AMBROSE FRY, DECEASED, MARSHALL O. MITCHELL, AD-
MINISTRATOR WITH THE WILL ANNEXED, PETITIONER, *v.* COM-
MISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 10341.   Promulgated September 30, 1947.

*Edward S. Bentley, Esq.,* and *Sperry Butler, Esq.,* for the petitioner.
*William B. Springer, Esq.,* for the respondent.

**OPINION.**

MURDOCK, *Judge*: The decedent was well and active at the time he made the gift of 100 shares of Feedwaters, Inc., to Lang. It was more than a year later that the prostatic condition caused him to consult a urologist and undergo an operation. The evidence shows that he had had difficulty in the past with those with whom he had been associated in the operation of Feedwaters, Inc., he had made similar gifts in prior years, he was well pleased with Lang and wanted him to continue as the manager of the business, and he gave the shares, not in contemplation of death, but to satisfy Lang and to retain his services, a motive connected with continued life.

The Commissioner does not contend that the 150 Feedwaters shares transferred to Muriel are to be included in the gross estate as a

transfer in contemplation of death. They were transferred as a reward to Muriel for her decision to stay with her father in this country and not in contemplation of death. The Commissioner argues that the decedent retained the income from those shares for a "period which does not in fact end before his death" within the meaning of section 811 (c).

The petitioner cites two cases in which bona fide sales were made of securities, with the provision that income from the securities would be applied on the unpaid balance of the purchase price. *Moore* v. *Commissioner*, 124 Fed. (2d) 991; *Levy* v. *United States*, 67 Fed. Supp. 958. It was held in those cases that the income from the securities was the income of the purchasers and was received by the sellers as part of the purchase price rather than as ordinary income. A different question is involved in the present case, based on different facts, and the two cases are not in point. Here, Muriel Fry, who received the shares, described the transaction as a gift with a string attached, such as her father was accustomed to giving so that the recipient would appreciate more the value of the gift. The petitioner does not contend that $15,000 was an adequate price for the 150 shares. Obviously a gift was involved in this transaction.

The decedent stated in the memorandum that he gave the shares to Muriel "subject to your giving me the first dividends on these up to $15,000." The substance of that transaction, regardless of its form, was that the decedent did not give the shares absolutely and completely, but made a transfer of the shares under which he retained, for a period which did not in fact end before his death, the right to all of the income from the property. It can not be fairly said that he did not retain the right to the dividends until they amounted to $15,000. Section 811 (c) requires that the value of the property under such circumstances be included in the gross estate. Cf. *Estate of Pamelia D. Holland*, 47 B. T. A. 807, modified, 1 T. C. 564.

The Commissioner determined that the gift of the mortgage certificates for the Lang children was made in contemplation of death. It was made in August and the decedent died in October. It is presumed under the statute to have been made in contemplation of death and the evidence does not overcome this presumption. The decedent died of cancer of the prostate. Some symptoms of his condition had been apparent to him at least since the fall of 1940. The evidence as to whether or not he ever realized that he had cancer and when he might have realized that for the first time is uncertain. This uncertainty might have been cleared up by the calling of a witness who accompanied the decedent on two occasions when he was examined by his urologist. Uncertainties in the evidence do not help the petitioner's case. There is some evidence from which it might fairly be

inferred that the petitioner knew his true condition and knew that he might not have long to live. It is difficult to believe that he did not know after his second visit to the urologist what his trouble was. He made several transfers of cash at or about that time, he was engaged in making a number of transfers of property at or about that time, and he wrote his last will on September 24 of that same year. It might fairly be inferred from these circumstances that he knew in August 1941 that he was stricken and might not have long to live. The Lang children were beneficiaries under his will. It is not apparent that the principal motive for the gift of the mortgage certificates to them in August 1941 was one connected with life rather than in contemplation of death. The evidence, as a whole, leaves a real doubt as to just what his motive was, but, suffice to say, that the evidence does not fairly preponderate in the petitioner's favor. This situation requires a finding upholding the determination of the Commissioner and such a finding has been made.

It is conceded that the value at the date of the decedent's death of 600 shares of Feedwaters, Inc., stock must be included in the gross estate. One hundred and fifty additional shares will be included in accordance with this opinion, or a total of 750 shares. The parties are in great disagreement as to the value of those shares. The petitioner reported 600 of the shares at a value of $129 per share. The Commissioner determined that the value per share was $316.52, which was about 10 times average earnings for a 6-year period. The petitioner now contends that the value was not in excess of $130 per share and the Commissioner contends that it was at least $300 per share. A finding must be made of the value of these closely held shares without the aid of evidence of actual sales. Two witnesses, with qualifications equally impressive, gave opinions supported by reasons. The expert called by the petitioner gave a value of $130 per share, while the one called by the respondent gave a value of $300 per share for a majority interest and a value of $255 a share for a minority interest. There is some evidence of the history, size, method of operation, management, earnings, dividends, finances, trials, tribulations, and prospects of the corporation. There is testimony that the war brought a number of difficulties into the business of Feedwaters and there is also evidence that it brought some benefits. The owners of the stock had placed a restriction upon its sale, providing that it could not be sold to outsiders until it had been offered at book value to other stockholders in a stated order. The restriction upon the sale of the stock must be considered as well as the possibility of the removal of that restriction. The book value applicable under this restriction was just under $130 per share. The witness for the petitioner testified that the actual value was about that same amount. But there is other evidence to show that the stock

had a value substantially greater than its book value. A secret formula seems to have been a valuable asset of the business. There is evidence that the decedent and Lang were of great importance to the corporation, but the evidence as a whole does not show that they were indispensable or that someone else, properly qualified, could not have operated the business successfully. The departure of Lang would not have deprived the corporation of the secret formula. There is other evidence of value. All of the evidence, whether conflicting or otherwise, has been considered. It does not lead irresistibly to any amount as the obviously correct value but, since a finding of a precise amount must be made, the Court has concluded, after considering all of the evidence in the case, that the value of the stock at the date of the decedent's death was $245 per share.

The next question is to determine the value of the British assets. The credit with Cavendish and the Liverpool Borax shares were blocked at the time of the decedent's death, i. e., they could not be transmitted to the United States nor could their equivalent at the official rate of the exchange be realized in any way in the United States. There was a lawful way, however, fully described by witnesses, under which a certain amount could be realized in the United States as a result of the decedent's ownership of those assets. The value of those assets to be included in the gross estate can not exceed that amount. *Morris Marks Landau*, 7 T. C. 12. The deposit at Barclays Bank was not blocked, but could be transmitted to the United States at the official rate of exchange.

The petitioner contends that the values of the British assets should be further discounted 50 per cent because of adverse claims by Cavendish and a son of the decedent. The evidence shows that Cavendish contended after the decedent died that the transaction resulting in the credit to him on its books was improper and was not owed because the property involved in the transaction had been a gift to Cavendish from the decedent. Cavendish and the son of the decedent also contended after his death that the Liverpool Borax shares had been given to them by the decedent before his death. The record does not show how serious these claims were or the extent to which they may have reduced the value of the decedent's property in those assets. The claims were promptly set at rest by actions instituted by the British fiduciary of the estate. There is no reason under the evidence of this case for concluding that those claims deprive the assets of half of their value at the time of the decedent's death. Whether they ever had any real merit, or whether they were merely raised by or on behalf of the decedent's family in England, in an effort to gain greater benefit from his estate, does not clearly appear. Some allowance has been made for those claims. The petitioner has failed to show that the value of the

British assets was less than $39,500. A finding that they had that value has been made.

Section 812 (b) allows claims against the estate as a deduction from the value of the gross estate. But it also provides that the deductions allowed, in the case of claims against the estate when founded upon an agreement, shall be limited to the extent that they were "contracted bona fide and for an adequate and full consideration in money or money's worth." The claim of Aimee P. Hare against the estate is founded upon a lease executed by the decedent. That was an agreement. The record does not show that it was "contracted bona fide and for an adequate and full consideration in money or money's worth," as required by the statute. It was contracted long after the decedent and his wife executed a warranty deed for the property to the petitioner's wholly owned corporation. His inconsistent actions in regard to the property are not explained, but it seems apparent that he was trying to make a gift to his friend, Aimee P. Hare, so that she could live on the property free of all charges for practically nothing. The evidence does not show that the Commissioner erred in disallowing the deduction of $1,000.

*Decision will be entered under Rule 50.*